IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VERSUS                                CAUSE NO. 3:03-cr-30-HTW-LGI

ROOSEVELT WALKER                                         DEFENDANT


MOTION FOR CLARIFICATION


BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT COURT JUDGE
DECEMBER 13, 2021
JACKSON, MISSISSIPPI


APPEARANCES:

FOR THE GOVERNMENT:  THEODORE COOPERSTEIN, ESQUIRE

FOR THE DEFENDANT:   OMADARE JUPITER, ESQUIRE


REPORTED BY:  TAMIKA T. BARTEE, B.C.R., RPR, CCR #1782

---

501 E. Court Street, Suite 2.500
Jackson, Mississippi  39201
Telephone:  (601)608-4188
E-mail:  Tamika_Bartee@mssd.uscourts.gov

TABLE OF CONTENTS

Style and Appearances..................................... 1

Proceeding................................................ 3


                    WITNESS:  ADAM BOLLAERT

Direct Examination By The Court........................... 8

Cross-Examination By Mr. Jupiter......................... 17

Cross-Examination By Mr. Cooperstein..................... 24

Further Cross-Examination By Mr. Jupiter............... 28,42


Certificate Page......................................... 45

1      THE COURT:  Good afternoon.  Call your case, please.

2      MR. COOPERSTEIN:  Good afternoon, Your Honor.

3  Ted Cooperstein for the United States.  We're here today in the

4  case of *United States of America v. Roosevelt Walker*.  Criminal

5  No. 3:03-cr-30-HTW-LGI.  We're here today on the defendant's

6  motion for clarification of a prior ruling.  And the defendant is

7  represented by the Federal Public Defender, Omadare Jupiter.

8      THE COURT:  All right.  This case concerns the defendant,

9  Mr. Roosevelt Walker, who is not present.  And, Mr. Jupiter, what

10  says you on the presence of Mr. Walker?

11      MR. JUPITER:  Mr. Walker has agreed to waive his presence

12  for this hearing, Your Honor.

13      THE COURT:  Okay.  Then, Mr. Walker's presence at this

14  hearing is hereby waived.  Where is his whereabouts?

15      MR. JUPITER:  Your Honor, he is in a federal facility,

16  I'm -- I'm embarrassed right now, because I've -- I've spoken to

17  him several times, and I know the facility, but the exact name of

18  the facility escapes me right now.

19      THE COURT:  But he is in a federal correctional facility?

20      MR. JUPITER:  He is serving this Court's sentence in a

21  federal correctional facility; yes, sir.

22      THE COURT:  All right.  And that is a penitentiary, is it

23  not?

24      MR. JUPITER:  That is correct, U.S.--

25      THE COURT:  Now, Mr. Jupiter, it's your motion, so could

1  you go to the podium, please.  You can remove your mask while you

2  make your motion.

3       MR. JUPITER:  Thank you, Your Honor.  Can you hear me,

4  Your Honor?

5       THE COURT:  Absolutely.  You're good.

6       MR. JUPITER:  Yeah, thank you, Your Honor.  Your Honor,

7  so, this motion -- I -- I don't have anything substantive to add

8  to what I've stated.  We -- obviously, the Court knows -- and

9  excuse me, I don't have any paper with me, but I do have my -- my

10  motion right here.

11       We filed our original motion for compassionate release in

12  this case.  As this Court knows, Mr. Walker is serving a life

13  sentence in this case.  We filed our original motion August 4th,

14  2020, seeking a reduction in sentence, pursuant to 18 U.S.C. 3582,

15  that was docketed No. 388.  And part of our request for release

16  was based on Mr. Walker's medical condition.  As has been our

17  practice, we, then, filed a motion on the same date to seek leave

18  to file his medical records under seal.  That motion was not

19  granted until after this Court denied the motion.  So we never

20  filed those records under seal.  The government filed their

21  response in opposition to our motion on August 17, 2020, without

22  any attachments.  And then, we filed a motion September 14th,

23  2020, to expedite the hearing, and another motion to file

24  additional medical records under seal.

25       On October 5th, this Court entered an order denying our

motion for compassionate release and ruled that -- the Court never

ruled on Mr. Walker's first motion to file his medical records

under seal, or his second motion to file his medical records under

seal.

In the District Court's order, it stated, "The

government" -- I'm quoting from the -- from this Court's order.

"The government provided copies of Walker's medical records from

BOP, and they show he is under constant and continuous care

to manage his medical conditions.  This Court does not find that

Walker has presented evidence that he suffers from a terminal

illness with an end-of-life trajectory."

And it goes on to deny, in a 24-page decision, the -- for

various different reasons, our motion for compassionate release.

We sought to appeal to the Fifth Circuit, and then -- so I called

the government counsel when I filed my appeal and said, "Well, we

need to make the medical records that were provided to the Court a

part of the record."

Government counsel indicated that they had never provided

the Court with any medical records.  I contacted probation, and I

said, "Well, did you guys give the Court medical records?"  They

indicated that they would not and could not do that.  Along with,

I contacted someone in BOP to see if the Court got Mr. Walker's

medical records some other kind of way, being that they were

referenced in the Court's order.  So no one seemed to be able to

say how the Court had received medical records.  So we entered a

1    joint motion to the Fifth Circuit to send the case back for

2    clarification to figure out what medical records were reviewed,

3    where did the Court get the medical records, so on and so forth.

4        The Fifth Circuit granted our joint motion -- I say,

5    "our," mine and the government's motion -- to send the case back

6    to the District Court, to Your Honor, for that clarification.  And

7    then I filed this motion for the Court to clarify where -- what

8    records were received, where did the Court get the records.

9    And -- and so that we could make the records a part of the Court

10    record.  So that's -- that's the purpose of us being here today.

11        THE COURT:  One second.  Don't move.  I'm on page 10 of my

12    opinion.  The last paragraph on page 10, it says the following:

13    "Walker lists the following medical conditions as placing him at

14    risk for contracting COVID-19:  pulmonary hypertension (high blood

15    pressure); diabetes; cellulitis; hyperlipidemia (high

16    cholesterol); and asthma."

17        Now, your client did contend that he suffered from these

18    particular conditions, correct?

19        MR. JUPITER:  Yes, Your Honor.

20        THE COURT:  Okay.  The next sentence:  "The government

21    provided copies of Walker's medical records from BOP, and they

22    show that he is under constant and continuous care to manage his

23    medical conditions."

24        Now, this is the sentence that bothers you.  Is that

25    correct?

1      MR. JUPITER:  Well, I think that's the sentence that would

2  indicate to me that the Court had records.

3      THE COURT:  I understand that, but that's the sentence

4  that's the focus of this particular motion, correct?  I mean,

5  that's the sentence --

6      MR. JUPITER:  That's part of it.

7      THE COURT:  Because you wanted to -- you were concerned

8  about the medical records from BOP, and they show that he is under

9  constant and continuous care to manage his medical conditions.

10  And you are curious as to where the Court obtained copies of his

11  medical records, correct?

12      MR. JUPITER:  Correct, Your Honor.

13      THE COURT:  Okay.  Now, this next sentence:  "This Court

14  does not find that Walker has presented evidence that he suffers a

15  terminal illness with an end-of-life trajectory.  Similarly, this

16  Court does not find that Walker's ability to provide self-care,

17  while in the custody of BOP is diminished and that he is not

18  expected to recover."

19      Now, what, again, is the centerpiece of your motion, is

20  this statement that this Court had copies of his medical records,

21  correct?

22      MR. JUPITER:  Had copies and reviewed copies of his

23  medical records in making this decision, yes, Your Honor.

24      THE COURT:  All right.  Correct.  Now, I've worked on this

25  case with my law clerk, Mr. Adam, over here -- Adam, over here.

1  And Adam, since you worked on this case with me, and provided some

2  matters on this particular order -- whereas, the factual basis

3  concerning the trial, and all of the evidence concerning the

4  trial, I wrote all of that personally.

5       Now -- but now, this part about the medical records,

6  because everything that concerns the trial, which starts over on

7  "Danger to the community" on page 13, where it starts, "Even if

8  this Court were to find that Walker had presented extraordinary

9  and compelling reasons to grant compassionate release, he still

10  has not demonstrated that he, 'is not a danger to the safety of

11  any other person or to the community, as provided in Title 18

12  United States Code, Section 3142(g).'"

13      And from there on, I have specific recollection of having

14  written everything in this opinion, because all of the commentary

15  from that point on concerned the trial, the background of the

16  prosecution, and what occurred during the course of the trial, et

17  cetera.  So I specifically wrote all that.  This part about the

18  records, this came from the law clerk, so I'll put him on the

19  stand and let him testify.

20      So Terri, would you swear in Mr. Adam.

21      (Witness sworn.)

22                    ADAM BOLLAERT,

23   Having been duly sworn and examined, testified as follows:

24      THE COURT:  Would state your full name?

25      THE WITNESS:  Yes, sir.  My name is Adam Anthony Bollaert.

1    THE COURT:  And you are one of my three law clerks.  Is

2  that correct?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  And, in fact, you are the career law clerk?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  Which means you don't have a term under which

7  you serve as law clerk?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  And that, whereas other law clerks rotate

10  after a certain amount of time and are required to rotate, you are

11  not required to rotate.

12    THE WITNESS:  That's correct, sir.

13    THE COURT:  In addition, there are some other special

14  considerations provided to you, namely, with regard to salary,

15  because you're paid more than the other law clerks, correct?

16    THE WITNESS:  Yes, sir.

17    THE COURT:  And in addition, you have a retirement

18  provision as a career law clerk?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  Other law clerks don't have that?

21    THE WITNESS:  That's correct, sir.

22    THE COURT:  Now, when I mentioned this case here,

23  Roosevelt Walker, to my courtroom deputy, you, then, came in to

24  see me.

25    THE WITNESS:  Yes, sir.

1     THE COURT:  And you said that I didn't have to have this

2  hearing, correct?

3     THE WITNESS:  That's correct, sir.

4     THE COURT:  And, please, explain why you said I didn't

5  have to have this hearing on those medical records.

6     THE WITNESS:  Yes, Your Honor.  That was a scrivener's

7  error on the medical records that was -- the Court didn't review

8  any medical records whatsoever.  I thought we could just enter an

9  amended order removing the offending language.

10    THE COURT:  But now, on this part about the medical

11  records --

12    THE WITNESS:  Yes, Your Honor.

13    THE COURT:  -- when I was given the draft on this matter,

14  I looked through it, and I saw that the draft of this opinion

15  follows the other COVID-19 compassionate release orders that I had

16  signed in other cases, that is, on the backdrop of what BOP has

17  done with regard to the COVID-19 pandemic.  And that is the same

18  language, is it not?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  So that I have -- or had, a number of cases on

21  this particular matter, and I still have a few left, but this

22  backdrop on this whole matter, starting on page 2, where the

23  heading is "BOP and the COVID-19 pandemic."  That gives the

24  backdrop of what BOP has been doing in addressing COVID cases

25  within its jurisdiction.  Is that correct?

1    THE WITNESS:  That is correct, sir.

2    THE COURT:  And in all of the cases that I have dealt with

3    concerning the COVID matter, they all had the same backdrop,

4    because it was common to all of those cases.

5    THE WITNESS: Correct.

6    THE COURT:  So then, since the backdrop was the same, what

7    I would do is just make it more specific to the case of the

8    individual who is filing.

9    THE WITNESS:  Correct.

10   THE COURT:  And since I tried the case, since I was the

11   trial judge with Roosevelt Walker, then after we go through what I

12   would consider to be boilerplate background information concerning

13   what BOP was doing, and once we got past the analysis, which is

14   also the same that it would be in any other case; and the

15   exhaustion of -- if there's been exhaustion, it would be the same.

16   The burden of proof would be the same in that section.  But then,

17   where it would be more specialized is where this opinion, as other

18   opinions, would get to the particulars concerning this particular

19   individual.

20   THE WITNESS:  That's correct, sir.

21   THE COURT:  And so, in his case, starting on page 13,

22   subsection (d), that is, the danger to the community, then I

23   personally wrote all of that?

24   THE WITNESS:  Yes, sir.

25   THE COURT:  So that was not assisted by you in the

1  background on all of that part?

2      THE WITNESS:  No, sir, aside from checking dates for you.

3      THE COURT:  Okay.  And so I did all of that.  Now, but

4  then, this hearing is to address Mr. Jupiter's concern about

5  medical records being submitted to the Court that the Court would

6  have read, unbeknownst to both the defense and prosecution.  Did I

7  receive any medical records?

8      THE WITNESS:  No, sir, you did not.

9      THE COURT:  So this sentence that's in this opinion is

10  wrong?

11      THE WITNESS:  Yes, sir.  That's my error.

12      THE COURT:  Well, then, can you tell us how that sentence

13  found its way into what otherwise would have been a boilerplate

14  introduction?

15      THE WITNESS:  When I was going through the records,

16  Your Honor, looking at everything, looking at the motion, I had

17  been working on several of them all at once.  And I just, I missed

18  that line.  I just, that was my failure.  That was my error.

19      THE COURT:  So then, how'd this line get in the order?

20  Did you place it in here?

21      THE WITNESS:  It was part of another order that I

22  modified, so I took the boilerplate language from another order,

23  and I don't remember the defendant's name.  And then I modified it

24  to reflect the prison he's at, what he alleges were his medical

25  conditions, so on and so forth.

1        THE COURT:  So this matter about a medical -- medical

2  records came from somewhere else?

3        THE WITNESS:  It came from another -- another order that

4  we had drafted, we did have medical records on, and I just -- I

5  must have missed it in this one.  And like I say, that's my error.

6        THE COURT:  "On the danger to the community," I wrote all

7  of that?

8        THE WITNESS:  Yes, sir.  Every bit of it.

9        THE COURT:  Now, that was my next question.  Did you have

10  anything to do with the danger to the community?

11        THE WITNESS:  No, sir.

12        THE COURT:  And after the "danger to the community," that

13  whole section that goes up to -- up to "home detention."  "Home

14  detention" was part of the boilerplate in other cases, was it not?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Because it says, "Walker, alternatively,

17  requests that this Court order BOP to place Walker on home

18  confinement to serve the remainder of his sentence.  Once a

19  sentence is imposed, BOP is clearly solely responsible for

20  determining an inmate's place of incarceration.  See 18 U.S.C.

21  Section 3621(b)."  There's a footnote 8 there, and some cases are

22  quoted.  "A Court has no authority to designate a prisoner's place

23  of incarceration."  And a case is cited for that proposition.

24  That was a boilerplate that I put in my COVID cases where somebody

25  had requested a special place of detention.  Is that correct?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  And then, there's the conclusion where the

3    motion for compassionate release due to COVID-19 is denied for the

4    reasons stated above.  And who made that conclusion?

5          THE WITNESS:  You did, sir.

6          THE COURT:  With regard, now -- you are now testifying as

7    a witness here about what transpired?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  On Friday, you said that after you heard me

10   mention to Terri, the courtroom deputy, that this matter was set

11   for today --

12         THE WITNESS:  Yes, sir.

13         THE COURT:  -- you, then, came to my office to tell me

14   what?

15         THE WITNESS:  To tell you that I didn't think we needed to

16   have a hearing; we could enter the amended order removing the

17   offending language.

18         THE COURT:  And the offending language concerned the

19   medical records?

20         THE WITNESS:  Correct.

21         THE COURT:  Did we have any discussion about this

22   offending language?

23         THE WITNESS:  I think I told you what they were asking

24   about, but I honestly can't remember, sir.

25         THE COURT:  Other than what you were telling me at that

1  time --

2          THE WITNESS:  Mm-hmm.

3          THE COURT:  -- had we had any conversation about this

4  matter prior to that?

5          THE WITNESS:  Not since we entered the order, no, sir.

6          THE COURT:  This matter was sent back from the Fifth

7  Circuit on agreed order of counsel?

8          THE WITNESS:  Correct.

9          THE COURT:  Did I have any conversation with you as to why

10 it was sent back?

11         THE WITNESS:  No, sir.

12         THE COURT:  Was I ever, at any point, told as to why it

13 was sent back?

14         THE WITNESS:  Not as far as I'm aware.

15         THE COURT:  Did you know why it was sent back?

16         THE WITNESS:  I knew about it once I saw the motion for

17 clarification, sir.

18         THE COURT:  Did we discuss that motion for clarification?

19         THE WITNESS:  Terri and I talked about it and --

20         THE COURT:  No, wouldn't that be before Terri got here,

21 when the motion came in, or I don't know.  You tell me.

22         THE WITNESS:  I don't know.  I thought it was recently

23 filed.

24         THE COURT:  But a motion for clarification?  Well, when

25 the matter came back from the Fifth Circuit, did we have any

1 conversation about why it came back?

2 THE WITNESS: No, sir.

3 THE COURT: Was there any conversation that Roosevelt

4 Walker's motion is back here before the Court?

5 THE WITNESS: No, sir.

6 THE COURT: So then, when this motion was filed for

7 clarification -- here it says it was filed on September 9, 2021.

8 Did you talk to me about this matter?

9 THE WITNESS: No, sir.

10 THE COURT: So, who set this for hearing?

11 THE WITNESS: Terri and I talked about it, and I thought

12 it might need to go for a hearing at that point. I think that's

13 what happened.

14 THE COURT: Well, tell me what you think happened.

15 THE WITNESS: I think Terri asked me what we needed to do

16 on that motion, and I said, "We probably should set it for a

17 hearing," sir.

18 THE COURT: Was I involved in setting this for a hearing?

19 THE WITNESS: No, sir.

20 THE COURT: So to your knowledge, the first time I knew

21 this matter was even set for a hearing is when I looked at the

22 docket sheet to see what I had in front of me?

23 THE WITNESS: Yes, sir.

24 THE COURT: So it was Friday when you came into my office,

25 correct?

```
 1            THE WITNESS:  Yes, sir.

 2            THE COURT:  Okay.  And it was Friday when you said that I

 3    didn't need to have a hearing?

 4            THE WITNESS:  That's correct, sir.

 5            THE COURT:  And my response was what?

 6            THE WITNESS:  That we were going to have the hearing.

 7            THE COURT:  Okay.  All right.  Stay right there.

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  Mr. Jupiter, it's your motion, so is there

10    anything you want to ask, Mr. Jupiter?

11                            CROSS-EXAMINATION

12    BY MR. JUPITER:

13    Q.   Good afternoon.

14    A.   Good afternoon, sir.

15    Q.   You've been a law clerk with Judge Wingate for how long?

16    A.   September of 2016, so just over five years.

17    Q.   And you've had other matters come back from the Fifth Circuit

18    before, right?  Let me clarify.  You've -- you've had -- you --

19    you provide legal -- you provide counsel to Judge Wingate on

20    matters that are pending before Judge Wingate?

21    A.    I believe that's a correct statement, if I understand the way

22    you're saying it.

23    Q.   Okay.  If I filed a motion and it was denied by

24    Judge Wingate, and I appeal to the Fifth Circuit --

25    A.    Mm-hmm.
```

1  Q.   -- and then it comes back to Judge Wingate --

2  A.   Yes, sir.

3  Q.   So when it would come back to Judge Wingate, what -- there's

4  something that comes back to Judge Wingate from the Fifth Circuit,

5  the chambers are notified.  Who would be notified in the chambers

6  that, Hey, something came back from the Fifth Circuit?

7  A.   Typically, it goes to our chamber's e-mail, and then also

8  typically one of the parties will e-mail us and counsel opposite

9  saying, Hey, this came back from the Fifth Circuit.

10 Q.   Okay.  So when it comes back from the Fifth Circuit and it

11 states -- you say it will go to chambers e-mail?

12 A.   Yes, sir.

13 Q.   Who checks that e-mail?

14 A.   All of us.

15 Q.   Okay.  So you checked that e-mail, and you saw it came back

16 from the Fifth Circuit?

17 A.   I can't recall seeing it, but it came back from the

18 Fifth Circuit.

19 Q.   Well, obviously, it must have, right?

20 A.   Sure.

21 Q.   It did come back from the Fifth Circuit.  Do you know what

22 date it got back from the Fifth Circuit?

23 A.   I do not, sir.

24 Q.   Okay.  So it came back from the Fifth Circuit, and you said,

25 all of you, in normal course, would have checked that e-mail from

1  the Fifth Circuit that it's back?

2  A.   Yes, sir.

3  Q.   It's been remanded by joint remand, correct?

4  A.   It comes in as an ECF notice for us.

5       THE COURT:  Explain to him who you mean by, "all of us

6  would check it."

7       THE WITNESS:  Oh, I meant all of the law clerks at the

8  time, because it's my understanding that it came back before Terri

9  got here.

10      THE COURT:  Okay.

11      THE WITNESS:  Now, it's all the law clerks and Terri.

12  BY MR. JUPITER:

13  Q.   Okay.  All right.  So at that point, you're saying that you

14  have no way -- unless counsel contacts you, you have no way of

15  finding out why it came back?

16  A.   That's not -- that's not what I said.

17  Q.   Right.  Because you have access to what was filed in the

18  Fifth Circuit to have it remanded back, don't you?

19  A.   Correct.  Through Pacer.

20  Q.   Right, through Pacer.  So you have at your fingertips

21  something that would have shown our joint motion as to why it came

22  back, correct?  If it came back by a joint motion of the parties,

23  you have access to how did the parties get it back over here?

24  A.   That's correct.

25  Q.   Okay.  You didn't check that, did you?

1  A.   Not that I recall, no, sir.

2  Q.   You don't have any information that anyone else in chambers

3  checked that when it came back here?

4  A.   Not that I know of, sir.

5  Q.   All right.  And you're saying -- and nobody from -- none of

6  the parties contacted you?

7  A.   Not that I'm aware of, sir.

8  Q.   Okay.  Then, after that, there's a motion for clarification

9  filed in September -- I believe, September 9th?

10  A.   Yes, sir.

11  Q.   Three months ago, correct?

12  A.   That's correct.

13  Q.   All right.  So when a motion is filed, who would have -- who

14  would have reviewed that motion coming in?

15  A.   Again, it comes in through the chamber's e-mail, through an

16  ECF notification.

17  Q.   Okay.  And who notifies the judge that, Hey, there's a motion

18  for clarification on something that came in this case that we

19  don't know why it's here?  Who would notify the judge?

20  A.   Well, in this case, that should have been me.

21  Q.   Okay.  Did you notify Judge Wingate --

22  A.   I did not.

23  Q.   -- at that time that there was a motion for clarification?

24  A.   I did not.

25  Q.   Are you aware of anybody contacting Judge Wingate and saying,

1  Hey, this motion that you disposed of went to the Fifth Circuit

2  and came back, and now they're asking for clarification, the

3  reason why it was filed, the remand was brought, and we set this

4  for a hearing?

5  A.   I -- I don't know that anybody did that.

6  Q.   Or could we just set out, as you indicated, explain what

7  happened here in this -- in this, you would agree with me,

8  contradictory order, correct?

9  A.   I wouldn't agree that it's a contradictory order.

10 Q.   Okay.  You said "offend-" -- I'm sorry.  You characterized it

11 as "offending language," right?

12 A.   The language that you find offensive, sir, yes.

13 Q.   Okay.  I'm sorry.  I didn't know you were referring to me.

14 You're saying the language that counsel found offending?

15 A.   Yes, sir.

16 Q.   Because I didn't characterize it as offending.

17 A.   Excuse me.

18 Q.   Okay.  I thought that's the way you were characterizing it.

19 How -- you were characterizing it in which way, as a scrivener's

20 error?

21 A.   Correct.

22 Q.   It was a statement of fact, right?

23 A.   It was a statement of fact, yes.

24 Q.   It was a statement of fact that the Court reviewed medical

25 records, correct?

1   A.   Correct.

2   Q.   And that was a statement that you wrote, correct?

3   A.   Correct.

4   Q.   To be part of Judge Wingate's order?

5   A.   Correct.

6   Q.   Okay.  Now, let me ask you this:  Are you saying as a matter

7   of course, that Judge Wingate does not personally review medical

8   records on a motion for compassionate release?

9   A.   No, sir.  That's not what I'm saying.

10  Q.   Okay.  Are you saying in the majority of cases, that he does

11  not review the medical records on motions for compassionate

12  release?

13  A.   That's not what I'm saying either.  To my knowledge,

14  Judge Wingate reviews every single document that's put in front of

15  him.  He reads them line-by-line, word-for-word.

16  Q.   And that's what he did in this case?  I'm asking you.  I need

17  a response.

18  A.   Yes, sir.

19  Q.   He read line-by-line, that the Court reviewed the records?

20  A.   That -- he read that.

21  Q.   And -- but, in fact, the Court had not reviewed any records.

22  A.   Again, that was my error, sir.

23  Q.   Well, I mean, you didn't sign the order, did you?

24  A.   There's no way I can sign the order.

25  Q.   Right.  Judge Wingate signed the order, right?

1    A.    Correct.

2    Q.    And you're -- you're saying that Judge Wingate read -- did he

3    rely on the fact -- was he relying -- let me ask it to you this

4    way:  Do you read records for him and tell him, Look, I've read

5    the records, and you can just say this?

6    A.    That's -- that's not the way Judge Wingate works.

7    Q.    I didn't think so.  That's why I'm asking you.

8    A.    That's not the way he works.

9    Q.    I didn't think so.

10   A.    I mean, you've been here for sentencing hearings.  You know

11   he goes through everything.

12   Q.    That's exactly why I'm asking the question, because I -- I've

13   been here a lot.  So he -- he would be the one who would read the

14   records?

15   A.    Well, we both would typically read the records.

16   Q.    Okay.  But I'm just trying to figure out, if he read

17   line-by-line in his order that "the Court has reviewed records

18   provided by the government."  If he read that and said, "The

19   records indicate that these -- that he has these conditions," and

20   made a finding that "these conditions do not put him" -- those

21   words, "in trajectory of life."  I'm -- I'm messing up the exact

22   wording, but something along those lines.

23        And, in fact, not only had he not read these records, but you

24   had not read these records.  Are you saying that he read that

25   line-by-line, or it was just a cut and paste?

1         THE COURT:  How would he know what I did?

2         MR. JUPITER:  That -- Your Honor, he's testified.  I'm

3 going off of what he's testified to.  He can testify --

4         THE COURT:  But how would he know what I did on reading?

5         MR. JUPITER:  Well, he has testified that you read it

6 line-by-line.

7         THE COURT:  On a normal case, but he doesn't know what I

8 did on this one.  So go ahead and ask your questions, though.

9 BY MR. JUPITER:

10 Q.  Is that what he normally does, read it line-by-line?

11 A.  That's been my experience with Judge Wingate, but I cannot

12 testify what he does specifically on each and every case.

13 Q.  Okay.  Okay.  But you're saying that in this particular case,

14 it was a cut and paste?

15 A.  I'm saying, in this particular case, we had been working on

16 multiple reviews all at the same time, and if it was anyone's

17 error, it was my error.  That's what I am saying.

18 Q.  And the first time that you had a discussion with him about

19 this motion that was filed three months ago, was Friday?

20 A.  That's correct.

21         MR. JUPITER:  No further questions.

22         THE COURT:  Any questions over here?

23         MR. COOPERSTEIN:  Yes.  Thank you, Your Honor.

24                       CROSS-EXAMINATION

25 BY MR. COOPERSTEIN:

1    Q.   Good afternoon.

2    A.   Good afternoon.

3    Q.   Just briefly to confirm a few points.

4    A.   Yes, sir.

5    Q.   You stated that you identified a scrivener's error, that

6    issue in this particular opinion of the Court?

7    A.   Yes, sir.

8    Q.   And you recommended an amendment to correct the scrivener's

9    error, correct?

10   A.   Correct.

11   Q.   Now, if that scrivener's error were corrected, would the

12   outcome or the decision of the Court, in this particular order,

13   remain the same?

14   A.   That's not for me to say, sir.  You'd have to ask

15   Judge Wingate.  I apologize.

16   Q.   Generally, would the portion of the order remain the same but

17   for that scrivener's error, and I'm referring to the portion that

18   addresses the claimed medical conditions stated and listed by the

19   defendant in his motion?

20   A.   You're saying if we take out that sentence --

21   Q.   Yes.

22   A.   -- would it change what I would propose to Judge Wingate, or

23   what Judge Wingate would sign?

24   Q.   I see.  What I'm specifically getting at is that, if we were

25   to follow your proposed amendment, affecting that one sentence at

1  issue, I guess, my question assumes the remainder of the opinion

2  would remain unchanged?

3  A.    The remainder of my proposed opinion to Judge Wingate --

4  Q.    All right.

5  A.    -- would remain unchanged --

6  Q.    Yeah.

7  A.    -- but that doesn't say how Judge Wingate would rule.

8  Q.    Okay.  I'm focusing on the order as it exists --

9  A.    Mm-hmm.

10  Q.    -- with the identified scrivener's error, and I'm supposing,

11  for purposes of my question, that we would remove or alter, as you

12  proposed, that scrivener's error, leaving the rest unchanged.

13  A.    I would remove my -- a proposed amendment would remove that

14  language referencing any medical records, and then I would give it

15  to Judge Wingate for his review, his corrections or his signature,

16  whichever he felt was more appropriate.

17  Q.    I see.  So what I'm focusing on in my line of questioning

18  right now is:  Only if we made that amendment to remove that

19  scrivener's error and left all -- assuming all else remained

20  unchanged, I'm focusing my questions to you, sir, as to how you

21  believe that might affect the import of the remaining opinion, the

22  remainder of the order without that sentence that would be

23  amended.  Is that too much of a hypothetical for you?

24  A.    I'm -- I'm not sure I can answer that question, quite

25  honestly.

1  Q.   Let me say it this way:  What I'm assuming is that if we were

2  to make the amendment of the scrivener's error that's been

3  identified --

4  A.   Mm-hmm.

5  Q.   -- and leave all else unchanged as it exists in the Court's

6  order, would that affect the outcome or the proposed -- in terms

7  of the language as written now, without any further change?

8        THE COURT:  Counsel, he can't answer that.

9        MR. COOPERSTEIN:  All right, then, I'm sorry for going too

10  speculative in my --

11        THE COURT:  I signed an order that said, that made certain

12  representations concerning the medical record, not knowing that

13  that inclusion was an error.  I did not see any medical records.

14        MR. COOPERSTEIN:  All right.

15        THE COURT:  So if I were to see the medical records, I

16  can't say that my conclusion would be the same.  I know what I

17  said about danger to the community, but I said -- but I wrote

18  all that after I wrote -- after I read the part about the medical

19  records.  Now, I can't say whether the inclusion of medical

20  records would affect that part of the opinion.  I have not seen

21  any medical records.

22        MR. COOPERSTEIN:  I see, Your Honor.  I didn't mean to

23  presume or prejudge the Court's thinking or thought processes.  I

24  just wanted to examine the language of the order as it existed.

25        THE COURT:  I don't see this as a matter where I just

strike through that particular sentence or sentences on the
medical records.  I have not seen it.  The defendant has a right
to submit his medical records.  I have not seen one medical record
in this matter.  And until I see a medical record, I can't speak
as to what my position would be in relationship to even that
section on danger to the community.  I would have to see the
medical records and assess them and weigh them.  I don't know what
those medical records provide.  I didn't know we had any.  And so,
we didn't have any, from what I see now.  And what was in the
opinion was part of a boilerplate from all the other COVID cases I
had handled.  And this was like a part of a COVID, as most of them
say -- not most of them, just about every last one -- well, not --
well, all of them.  But I dealt with them.  If it was something
different, then I would write it.  But this is what it said, and
this is what wound its way into the opinion.  Now, it had no
business being in there.  But I can't say what the outcome would
be if this matter is deleted.  I can't say that.  I would have to
see those records.

        MR. COOPERSTEIN:  Well, I have no further questions, then,
on that line, Your Honor.  Thank you.

        THE COURT:  Okay.

        Mr. Jupiter, any other questions?

        MR. JUPITER:  Just one.

        THE COURT:  Okay.

                    FURTHER CROSS-EXAMINATION

BY MR. JUPITER:

Q.   Has this Court ever granted or denied a motion for

compassionate release without anyone having reviewed records?

     THE COURT:  Say that again, now?

BY MR. JUPITER:

Q.   Has Judge Wingate granted or denied any motion for

compassionate release without reviewing medical records?

A.   I mean, not that I'm aware of.

     MR. JUPITER:  That's it, Your Honor.

     THE COURT:  All right.  You can step down.  You can step

down.

     THE WITNESS:  Thank you, sir.

     (Witness excused.)

     THE COURT:  Let me turn to these medical records.

Mr. Jupiter, are there medical records that you had wanted to make

part of the record?

     MR. JUPITER:  I can make some medical records part of the

records, Your Honor.  I would, in light of what the Court has

disclosed, I would ask that this matter be assigned to a different

judge for determination of the motion for compassionate release.

     THE COURT:  And what would be the basis for that?

     MR. JUPITER:  Your Honor, this Court has already denied

the motion without reviewing medical records, and I don't know how

the Court can now take a fresh look at everything after its

already, as this Court has pointed out, in its own hand, written

1    out a lengthy decision denying the motion.  And saying that even

2    if his medical situation were different -- it wasn't just that one

3    section the Court referred to, but the Court said, even if his

4    medical situation were different, I would deny the motion.

5          So at this point, I don't feel like Mr. Walker has gotten

6    a fresh look at the motion, with his proposed attachments, which I

7    think are essential to every -- an essential part of his motion

8    for compassionate release was based on his medical condition, and

9    that motion was denied.  I can't see how this Court would, at this

10   point, be in a position to step aside and say, Well, forget what I

11   did before; now, I'm going to give it a fresh look.  I just don't

12   see that.  So I would ask that the Court would assign it to a

13   different judge, who would look at the whole motion, as well as

14   his current medical records, and be able to have a fresh look at

15   everything.

16          THE COURT:  Okay.  What says the government on this same

17   motion, on this ore tenus motion?

18          MR. COOPERSTEIN:  Your Honor, with regard to the

19   procedural matter of the record, we have no objection to any

20   attempt by the defendant to supplement the record with any

21   records.  We have no objection to submission of records.

22          With regard to the Court remaining on this case, we would

23   oppose any attempt to reassign the case.  We believe that the

24   Court's familiarity, having been the trial judge from the

25   beginning of the case, far outweighs any perceived problems.  And

1    we have no problem or objections that the Court can review this

2    matter de novo, with the benefit of a supplemented record, and

3    achieve a right result.

4        THE COURT:  All right.  Thank you.

5        Anything else, Mr. Jupiter?

6        MR. JUPITER:  No, Your Honor.

7        THE COURT:  I'll take the request under advisement.  But

8    in the meantime, two things:  One, Mr. Jupiter, you said you had

9    medical records.  Then, in case the Court keeps the case, I'd like

10   to have those medical records filed under seal.  Is that a

11   problem?

12       MR. JUPITER:  No problem, Your Honor.

13       THE COURT:  Okay.  And the second thing, Mr. Jupiter, if

14   you feel like you have some case on point concerning this matter,

15   I'm going to give you five days to submit that authority.

16       MR. JUPITER:  Concerning reassignment?

17       THE COURT:  Yes.

18       MR. JUPITER:  Yes.  Yes, sir.

19       THE COURT:  And then, from the government's perspective,

20   if you have any cases, one way or the other, then you have those

21   same five days, that you also have the opportunity to respond to

22   Mr. Jupiter's cases.

23       And, Mr. Jupiter, you have a right for a rebuttal, if you

24   find that he cites some cases that need some kind of response from

25   you.  So let's do it this way:

 1     Mr. Jupiter, file -- how long from now would it take you

 2 to file your records under seal?

 3     MR. JUPITER:  Well, Your Honor, I -- I have numerous

 4 records already.  I haven't gotten an updated -- you know, an

 5 update on my client's current records, probably in some months.

 6 So --

 7     THE COURT:  Okay.  How much time do you need?

 8     MR. JUPITER:  Well, I'll file -- well, I'll file what I

 9 have, Your Honor.  I think the Court might be interested in -- in

10 what I had and what I would have filed, I guess, at the time.

11     THE COURT:  Well, but if things have changed, Mr. Jupiter,

12 then I need to know that, too, now, in case I keep the case,

13 because I will ask that same question.

14     MR. JUPITER:  Well, yeah, BOP's -- sometimes -- they've

15 been pretty good historically.  I haven't -- you know, it's been

16 awhile since we've filed a motion for compassionate release.  But

17 when we were doing them regularly, they were turning over records

18 pretty quickly.  So I don't want to route myself in, but I would

19 ask for, just to be on the safe side, maybe -- maybe -- next week

20 is Christmas, so maybe until the end of next week, I don't know,

21 before the Christmas break.

22     THE COURT:  Just give me a time, Mr. Jupiter.  I'm going

23 to give you whatever you need.

24     MR. JUPITER:  To file updated records?

25     THE COURT:  Mm-hmm.  So I want to make sure that if you

1 submit some more -- some records under seal, that they are

2 complete. So how much time you think you'll need?

3     MR. JUPITER: Well, why don't -- why don't I go ahead and

4 be on the safe side and -- and put it into January.

5     THE COURT: January what?

6     MR. JUPITER: Say, January 3rd.

7     THE COURT: Okay. January 3rd. And how long would it

8 take you to file your authority, if you have any supplemental

9 authority you want to file?

10     MR. JUPITER: If the Court would allow me until -- let's

11 see, today is Monday the 13th. If the Court would allow me until

12 Monday the 20th.

13     THE COURT: That's enough time?

14     MR. JUPITER: I think so.

15     THE COURT: I thought you had a lot of other things on

16 your plate?

17     MR. JUPITER: Yeah, I'm not going do it, Your Honor,

18 myself.

19     THE COURT: You sure the 20th is okay?

20     MR. JUPITER: Why don't we just -- since this matter has

21 been pending for this long, why don't we just also put it into the

22 new year, to the 3rd.

23     THE COURT: Whatever you want; so the 3rd is okay with

24 you?

25     MR. JUPITER: Yes, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. JUPITER:  I'll try to get it done before then but --

 3              THE COURT:  Okay.  Thank you.  Now, to the other side.

 4     You won't get his motion until the 3rd.  Now, that is his

 5     authorities.  How much time do you need to make your response to

 6     his authorities?

 7              MR. COOPERSTEIN:  I would default to the standard time

 8     period.  According to the local rules, I think, about 11 days,

 9     Your Honor, is what this says.

10              THE COURT:  Is that what you want?

11              MR. COOPERSTEIN:  Yes, sir.

12              THE COURT:  Okay.  Then you have, all right, 11 days

13     thereafter, and what day would that be?

14              MR. COOPERSTEIN:  You said his would be due January the

15     3rd?

16              THE COURT:  Yes.

17              MR. COOPERSTEIN:  Then that would make it January 14th,

18     for us, then.

19              THE COURT:  Okay.  Let's go back to you -- thank you.

20     Let's go back to you, Mr. Jupiter.  If you want to file a

21     rebuttal, I'll give you five days thereafter, if you want it.

22              Now, if you're saying that you might not want it, or at

23     least if you don't want it, then I won't provide it in the order;

24     otherwise, I'll put it in the order that you have five days

25     thereafter, use it or not use it.
```

1    MR. JUPITER:  That's fine, if you could put it in the

2  order.

3    THE COURT:  Okay.  It will be placed in the order, but if

4  you decide you don't need it, then notify me if I still have the

5  case, okay?

6    MR. JUPITER:  Yes, Your Honor.

7    THE COURT:  Now, Mr. Jupiter it's your motion.  Is there

8  anything else that you want to submit in reference to this matter?

9    MR. JUPITER:  No, Your Honor.

10    THE COURT:  Okay.  Let me turn to the prosecution.  Is

11  there anything else, Mr. Cooperstein, that you want to submit in

12  reference to this motion?

13    MR. COOPERSTEIN:  I can't think of anything right now,

14  Your Honor, subject to reviewing the briefs, and see if there are

15  any other case citations we might find, but there's nothing else.

16    THE COURT:  Okay.  Counsel, thank you very much.

17    And Terri, hold on to this.  Put it on the rotary, okay?

18    One second, hold it, before we end.  Let me just see if

19  there's anything else I need to put on the record here.  Just a

20  second, let me think about something.

21    At this juncture, I don't know whether it's going to be

22  germane or not to this matter.  But Adam, would you just stand up

23  right there.  Consider yourself still under oath.  So the parties

24  can hear you and my court reporter won't have any problems.

25    You made a reference during your testimony that Terri, the

1  courtroom deputy, was not here at a certain time.

2       THE WITNESS:  Yes, sir.

3       THE COURT:  What do you mean by Terri not being here?

4       THE WITNESS:  Terri started with our office, I think, in

5  August of this year.

6       THE COURT:  And she is the courtroom deputy?

7       THE WITNESS:  Correct.  Yes, sir.

8       THE COURT:  Prior to her being hired, what was the

9  procedure in the office concerning the office's operations

10 relative to a courtroom deputy's chores on the various cases?

11      THE WITNESS:  Law clerks would step in the courtroom

12 deputy role for each one of the cases that we were assigned.

13      THE COURT:  And tell how you were assigned cases.

14      THE WITNESS:  By terminal digits of the case numbers.

15      THE COURT:  This was a procedure worked out with the

16 Court's permission by the law clerks?

17      THE WITNESS:  Yes, sir.

18      THE COURT:  I did not promulgate the procedure.  The three

19 law clerks got together and decided on this procedure.

20      THE WITNESS:  Yes, sir.

21      THE COURT:  And under that procedure, you would check the

22 terminal digit of a case, that is, the last digit of a case, and

23 that would determine which law clerk was going to handle the law

24 clerk duties on that case?

25      THE WITNESS:  Yes, sir.

1    THE COURT:  It also determined who would handle this case
2  in the role of a courtroom deputy?
3    THE WITNESS:  Yes, sir.
4    THE COURT:  Because I did not have a courtroom deputy at
5  that point?
6    THE WITNESS:  Yes, sir.
7    THE COURT:  And I later hired Terri, who is now here as a
8  courtroom deputy?
9    THE WITNESS:  Yes, sir.
10    THE COURT:  So then, on those terminal digits, each law
11  clerk had terminal digits that the law clerk was in charge of
12  reviewing the cases, acting in the role of a courtroom deputy.
13    THE WITNESS:  Yes, sir.
14    THE COURT:  And also advising me in the role of a
15  courtroom deputy.  Is that correct?
16    THE WITNESS:  Yes, sir.
17    THE COURT:  As well as performing chores as a law clerk?
18    THE WITNESS:  Yes, sir.
19    THE COURT:  So each one of you performed chores as a
20  courtroom deputy as well as a law clerk?
21    THE WITNESS:  Yes, sir.
22    THE COURT:  On this particular case, how did you end up
23  with this case?
24    THE WITNESS:  I believe it ends with one of my terminal
25  digits, Your Honor.

1          THE COURT:  You have more than one terminal digit?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And so it was supposed to be automatic, that

4     when a case came in with your terminal digit, that case was

5     assigned to you automatically?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  No matter what the origin was?  I mean, if it

8     was a case that went to the Fifth Circuit and came back, but we

9     didn't have very many cases during that time period, I don't

10    believe.  But if one went to the Fifth Circuit and came back, you

11    would simply look at the terminal digit?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  And so, this particular case had your terminal

14    digit?

15         THE WITNESS:  I believe so, sir.

16         THE COURT:  And you had more than one terminal digit?

17         THE WITNESS:  0, 1, 2, 3.

18         THE COURT:  Okay.  And then if it had your digit, then you

19    were responsible for that case, both as a law clerk, and as a

20    courtroom deputy?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Has the system changed now?

23         THE WITNESS:  It changed during 2020, during the COVID

24    pandemic when most people were working remotely.  You and I were

25    the only two in the office during that time, so I took over CR

1 duties for all cases.  But if you're asking about have we changed

2 our procedure on the terminal digits, now, currently, is that what

3 you're asking, sir?

4   THE COURT:  Well, I'm making some adjustments to that now.

5 And I've already spoken to you all about that, that I am making

6 adjustments.  But during the time period when this came through,

7 then, let's see, of the three law clerks -- of the three law

8 clerks, we had a number of COVID -- well, of the three law clerks,

9 Nav -- well one of the law clerks, was out of the office and

10 working from home?

11   THE WITNESS:  Yes, Your Honor.

12   THE COURT:  Because of her medical condition?

13   THE WITNESS:  Yes, sir.

14   THE COURT:  And Carmen was out of the office for a period

15 because of her mother's medical condition?

16   THE WITNESS:  That's correct, sir.

17   THE COURT:  So during most of that time, you and I were

18 the ones who were here?

19   THE WITNESS:  Yes, sir.

20   THE COURT:  And then on the COVID cases, the COVID cases,

21 we had a number of the COVID cases that all came in about the same

22 time?

23   THE WITNESS:  That's correct, sir.

24   THE COURT:  And so, during that time period, who was

25 handling most of the COVID cases?

1          THE WITNESS:  I was, Your Honor.

2          THE COURT:  And during that time period, did the other two

3     law clerks handle as many COVID cases as you did?

4          THE WITNESS:  No, sir.

5          THE COURT:  Was there a reason for that?

6          THE WITNESS:  You asked me to handle those, sir.

7          THE COURT:  Did I ask you or you volunteered to do it?

8          THE WITNESS:  Judge, I -- I recall you asking me to do it,

9     but I know you've said that I volunteered to do it, so I just

10    don't remember.  As far as I remember --

11         THE COURT:  Okay.  And during that time period when all of

12    those COVID cases were there, what was our position as to how

13    quickly we should get those COVID cases out?

14         THE WITNESS:  As rapidly as possible.

15         THE COURT:  There was a time when I assigned some of those

16    COVID cases to the other two law clerks.  Do you recall that?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Tell them under what circumstances I did that,

19    if you know.  Was there any time when you were out of the office

20    for a while?

21         THE WITNESS:  Yes, sir, there was.

22         THE COURT:  Was there any time period when you were out of

23    the office more than a week?

24         THE WITNESS:  Yes, sir; two weeks.

25         THE COURT:  And would you tell them why you were out of

1  the office for two weeks?

2      THE WITNESS:  I had a personal family issue that I had to

3  deal with.

4      THE COURT:  And so then, you were out of the office for

5  two weeks?

6      THE WITNESS:  Yes, Your Honor.

7      THE COURT:  And during the time that you were out, to your

8  knowledge, did the other law clerks manage to come back from home,

9  working home -- home labors?

10      THE WITNESS:  Yes, sir.  They had stopped working remotely

11  by that point.

12      THE COURT:  And then what did I do with the COVID cases?

13      THE WITNESS:  Had them take over their cases that they

14  were assigned terminal digits for.

15      THE COURT:  And so then, they handled their COVID cases?

16      THE WITNESS:  Yes, sir.

17      THE COURT:  When you came back, did you have an

18  opportunity to check to see what the status of the COVID caseload

19  was?  Do you know what it was at that point, when you came back?

20      THE WITNESS:  I mean, I looked at it when I came back,

21  yes, Your Honor.

22      THE COURT:  Okay.  And when you came back, to your

23  knowledge, what was the status of our COVID cases?

24      THE WITNESS:  I still had some on the table, but I think

25  the other two law clerks had finished theirs up.

1          THE COURT:  Okay.  And then, what I was left with, would

2   you agree, were cases that were incomplete, the filings had not

3   been fully briefed on those matters?

4          THE WITNESS:  Yes, sir.  Or we were waiting on medical

5   records because we were waiting on -- and there were two of them

6   we were waiting on assignments of an attorney by the mag judge.

7          THE COURT:  By "mag judge," you mean the magistrate judge?

8          THE WITNESS:  Magistrate judge, I'm sorry, sir.

9          THE COURT:  So then, on those COVID cases that were still

10  on the Court's docket, did the Court address most of those cases,

11  if not all of them?  Do you know?  Do you know how many cases

12  still needed tweaking at that point?

13         THE WITNESS:  As of today, I don't.

14         THE COURT:  And as of today, what's the status of the

15  distribution of the COVID cases?

16         THE WITNESS:  We all work on our terminal digits.

17         THE COURT:  So now, all of the law clerks work on COVID

18  cases?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Okay.

21         Mr. Jupiter.

22                     FURTHER CROSS-EXAMINATION

23  BY MR. JUPITER:

24  Q.   Do you know how many -- and Judge Wingate refers to "the

25  COVID cases," these are the motions for compassionate release that

1   are related to the COVID pandemic?

2   A.   Yes, sir.

3   Q.   Do you know how many there were total that were filed?

4   A.   I couldn't begin to tell you, and I would hate to hazard a

5   guess.

6   Q.   Okay.  I mean, was it more than a hundred?

7        THE COURT:  You mean on compassionate release cases?

8        MR. JUPITER:  Yeah.

9        THE COURT:  No.  A 100?

10       MR. JUPITER:  I'm just trying to get, were there more than

11  20?

12       THE WITNESS:  I don't know.  I can't -- I'm not going to

13  hazard a guess.

14  BY MR. JUPITER:

15  Q.   Were any granted?

16  A.   Sir?

17  Q.   Were any granted?  Any of these motions granted?

18  A.   Not that I'm aware of.  But, again, I don't know.  Some were

19  entered by the other law clerks, that they worked on with Judge

20  Wingate and Judge Wingate signed for.

21       MR. JUPITER:  Okay.  No further questions.

22       THE COURT:  Anything else over here?

23       MR. COOPERSTEIN:  No, thank you, Your Honor.

24       THE COURT:  All right.  Thank you.  Give her back the

25  microphone.

1          All right, folks, we have a schedule.  We'll put an order

2     in on this as soon as possible, okay?  All right.

3          (Court adjourned.)

1                    COURT REPORTER'S CERTIFICATE

2

3        I, Tamika T. Bartee, Certified Court Reporter, in and for

4   the State of Mississippi, Official Court Reporter for the United

5   States District Court, Southern District of Mississippi, do hereby

6   certify that the above and foregoing pages contain a full, true,

7   and correct transcript of the proceedings had in the aforenamed

8   case at the time and place indicated, which proceedings were

9   recorded by me to the best of my skill and ability.

10       I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial Conference

12  of the United States.

13       THIS the 31st day of December, 2021.

14

15

16                         *s/ Tamika T. Bartee*

17                         Tamika T. Bartee, BCR, RPR, CCR #1782
                           Official Court Reporter
18                         United States District Court
                           Tamika_Bartee@mssd.uscourts.gov
19

20

21

22

23

24

25